## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CIV-62700-RAR

**SARA DANESHPAJOUH**,

    Plaintiff,

v.

**SAGE DENTAL GROUP OF FLORIDA, PLLC,** *et al.,*

    Defendants.

_____/

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon the Motion for Summary Judgment [ECF No. 56] filed by Defendants Sage Dental Group of Florida, PLLC, Sage Dental Management, LLC, and Sage Dental of Pompano Beach, P.A. (collectively, "Sage Dental" or "Defendants").  Having considered the parties' written submissions, the record, and applicable case law, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [ECF No. 56] is **GRANTED** as set forth herein.

### BACKGROUND

This is an employment discrimination action stemming from Plaintiff's termination from her former employer, Sage Dental.  Before the Court can dive into the record and recount the undisputed facts on which Defendants' Motion turns, it must first address the deficiencies of Plaintiff's statement of facts submitted in opposition to Defendants' statement of facts.  After all, it is the comparison of those two documents that guides the Court in determining which facts are indeed undisputed by the record evidence.

## I.    Plaintiff's Statement of Facts and the Applicable Rules

In support of their Motion for Summary Judgment, Defendants filed their Statement of Undisputed Material Facts [ECF No. 57] ("DSOF"), laying out the facts they believe are undisputed by the record and require the entry of judgment in their favor.  Naturally, Plaintiff sought to counter the proposition that certain facts were undisputed in her Response in Opposition to Defendants' Statement of Undisputed Facts in Support of Summary Judgment [ECF No. 97] ("PSOF").  But there is a problem: for a sizable number of facts asserted by Defendants—many of which are significant to the legal issues in this case—Plaintiff merely states that these facts are "disputed" without any elaboration or citations to the record.  This is a violation of both the Federal Rules of Civil Procedure as well as the Local Rules of the Southern District of Florida.

Rule 56 of the Federal Rules of Civil Procedure requires that "[a] party asserting that a fact cannot be *or is genuinely disputed* must support the assertion by: citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B) (emphasis added).  Likewise, the plain language of Local Rule 56.1 requires both the movant and non-movant to support their factual statements with "specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits."   S.D. Fla. L.R. 56.1(a)(2); *see also* S.D. Fla. L.R. 56.1(b)(2) ("If an opponent's Statement of Material Facts disputes a fact in the movant's Statement of Material Facts, then the evidentiary citations supporting the opponent's position must be limited to evidence specific to that particular dispute."); S.D. Fla. L.R. 56.1(b)(3) (noting that the movant may respond to a non-movant's additional facts, "if disputed, [by] citing to particular parts of materials in the record in the same manner as required by subsections (b)(1) and(b)(2)."). "The local rule is unambiguous:

it requires specific references to record evidence in the statement of undisputed facts or the opposition to that statement (i.e., a *de facto* statement of disputed facts)." *Katchmore Luhrs, LLC v. Allianz Glob. Corp. & Specialty*, No. 15-23420, 2017 WL 432671, at *2-3 (S.D. Fla. Jan. 31, 2017) (explaining that a non-movant's summary judgment opposition violated the Local Rule where it "merely listed which paragraphs it disputes" and "did not explain why—and it surely did not include specific references to record evidence (such as deposition testimony or interrogatory answers).").

This is not some formalistic requirement meant only to provide an easy way to say "gotcha" to nonconforming litigants.  To the contrary, as this Court has recently explained, "Local Rule 56.1 serves the valuable purpose of crystallizing the relevant factual disputes for the Court by allowing the non-movant to contest the specific factual assertions in each paragraph of the movant's statement." *Laremore v. Holiday CVS, LLC*, No. 20-61650, 2021 WL 3053348, at *3 (S.D. Fla. July 20, 2021).  Thus, "[w]hen parties comply with the Rule, 'it is relatively easy for a court to determine whether there is a genuine disputed issue of fact.  Basically, all a court needs to do is to look at the opposing statement of material facts on a paragraph-by-paragraph basis, see whether any paragraphs are designated as disputed and then make note of the evidentiary reasons for the dispute.'" *Id*. (quoting *Berkower v. USAA Cas. Ins. Co.*, No. 15-23947, 2017 WL 1250419, at *3 (S.D. Fla. Apr. 4, 2017)).  "When a party does not comply with the Local Rule by referencing record evidence, however, then it is exceedingly difficult for a court to discern if there is an actual factual dispute concerning a specific paragraph.  A court needs to review the entire opposing memorandum and exhibits to determine whether there is a sound factual basis for saying that a point deemed factually undisputed by the movant is actually disputed." *Katchmore Luhrs, LLC*, 2017 WL 432671, at *2.  This would effectively have the Court do the nonconforming litigant's

job for her, which is why such a result is prohibited by the federal and local rules in the first place. *Id.  Accord Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (explaining that judges "are not like pigs, hunting for truffles buried in briefs . . .") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006) (explaining that courts do not have "an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention.").

"Plaintiff's failure to comply with the Local Rules essentially leaves the Court with 'the functional analog of an unopposed motion for summary judgment.'" *Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1343 (S.D. Fla. 2015) (quoting *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)).  Thus, the Court deems admitted the facts submitted by Defendants that Plaintiff failed to properly rebut.  *State Farm Mut. Auto. Ins. Co. v. Health and Wellness Servs., Inc.*, 446 F. Supp. 3d 1032, 1044 (S.D. Fla. 2020) (deeming facts admitted where the non-movant's "attempts to dispute [the movant]'s allegations [] failed to cite to the record at all").  Although these facts are deemed admitted, however, the "[C]ourt must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).  "This requirement provides the Court an opportunity to address the merits of the motion." *Lugo*, 154 F. Supp. 3d at 1343.  Accordingly, to the extent Defendants' factual allegations are properly supported by the record, the Court deems the following paragraphs of their Statement of Facts admitted: 5, 6, 13-19, 23, 25-26, 28-29, 32, 37-38, 40, 42, 44, 47, 51.[1]

---

[1] Plaintiff's Statement of Facts also violates Local Rule 56.1(b)(2)(D) by listing her additional facts in paragraphs beginning with "1" instead of the next number following Defendants' last numbered paragraph. S.D. FLA. L.R. 56.1(b)(2)(D) ("Any additional facts that an opponent contends are material to the motion for summary judgment shall be numbered and placed immediately after the opponent's response to the movant's Statement of Material Facts.  The additional facts shall use separately numbered paragraphs *beginning with the next number following the movant's last numbered paragraph*.") (emphasis added).  This rule is meant to underscore which *additional* facts are relevant to the motion as opposed to which facts are simply in dispute.  And more simply, it avoids confusion by preventing the non-movant from citing

## II.     The Undisputed Facts

In light of the above, the relevant undisputed facts are these.[2]  Plaintiff began working at Sage Dental (formerly named Gentle Dental of Pompano Beach, P.A.) in December 2012.  DSOF ¶¶ 2, 13.  The terms of her employment agreement provided that Plaintiff could be terminated at any time and for any reason provided that she was given 90-days' notice.  DSOF ¶ 6.  During the time period relevant to this litigation, Plaintiff was the "main dentist" at Defendants' Pompano Beach office.  *Id.* ¶ 13.  From shortly after the time she was hired to late 2016 or early 2017, Plaintiff was supervised by Dr. Antonio Cruz, who was then the Associate Dental Director and oversaw the dentists in the southern region.  Dep. of Dr. Antonio Cruz [ECF No. 58-7] ("Cruz Dep.") at 7:8-9:23.

Under Dr. Cruz's supervision, Plaintiff's performance was marked by difficulties regarding her interpersonal interactions with staff and patients.    For example, on March 21, 2014, after another employee complained that Plaintiff had created a hostile work environment for her, Dr. Cruz counseled Plaintiff about the importance of fostering a positive work environment as a leader of the office and the specific negative actions she had taken that had contravened that effort.  DSOF ¶ 23 (citing a contemporaneous memorandum from Dr. Cruz to Plaintiff memorializing the interaction between them).  Dr. Cruz met with Plaintiff again on December 9, 2015, in an effort "to communicate various issues" and "to reverse the trend of patient dissatisfaction that ha[d] been brought to [his] attention."  Memorandum from Dr. Tony Cruz DMD, Regional Dental Director to

---

evidence under the same paragraph number but different facts.  For example, using Plaintiff's Statement of Facts, if the Court were to cite to "PSOF ¶ 5," it is unclear if that is paragraph 5 on page 1 or on page 6.  Nevertheless, the Court will not sanction Plaintiff for this violation.

[2] The facts recited here may not be the "actual" facts of the case but reflect Plaintiff's best case as the nonmoving party from the record evidence.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

Dr. Sara Daneshpajouh (Dec. 14, 2015) [ECF No. 58-10].  Dr. Cruz "shared patient reviews and information [he] personally acquired from speaking to some patients and talking to staff" and Plaintiff "agree[d] that [she] would be more aware of [her] interactions with patients and staff in an effort to minimize dissatisfaction and to foster a more positive working environment." *Id.*

Dr. Cruz testified that other employees left the company because of repeated negative interactions with Plaintiff, and he provided three examples of such employees as well as an explanation of the circumstances surrounding their respective departures.  DSOF ¶ 15; Cruz Dep. at 67:2-70:2.  According to Dr. Cruz, these interpersonal issues were not limited to employees and patients.  He testified that one of the laboratories that Sage Dental uses to process impressions fired Plaintiff as a client "[n]ot because of the work she did but her abrasiveness, the way she treated" the company's employees.  Cruz Dep. at 103:19-104:13.  This was the first and only time in Dr. Cruz's 25 years of practice that he had ever seen a laboratory fire a dentist.  DSOF ¶ 15.

Defendants also took issue with certain aspects of Plaintiff's clinical performance and decision-making, particularly regarding the time spent with patients relative to the scope and price of her recommended treatment plans.  For example, at that December 9, 2015 meeting, Dr. Cruz discussed an online review complaining that Plaintiff had spent five minutes with a patient before recommending a $21,000 treatment plan.  *Id.* ¶ 25.  The contemporaneous memorandum states that Dr. Cruz asked Plaintiff to "slow down when [she was] treatment planning and making decisions and to spend more time with [her] patients."  *Id.*  Dr. Cruz testified that this was one of many similar incidents involving Plaintiff complained of by patients.  Cruz Dep. at 35:1-24.

In late 2016 or early 2017, Dr. Miguel Montilla, a Senior Dental Director, became Plaintiff's direct supervisor, but Defendants continued to see the same problems with Plaintiff's performance.  DSOF ¶ 18.  Dr. Montilla took issue with the time Plaintiff spent with patients

relative to the price of the treatment plans she would recommend, explaining generally that patients would "go visit the Pompano office and [] see Dr. Danesh[pajouh] for 30 minutes.  Next thing you know she is telling you you need $15,000 worth of work."  Dep. of Dr. Miguel Montilla [ECF No. 58-5] ("Montilla Dep.") at 20:15-21-9.  According to Dr. Montilla, this would prevent patients from returning.  *Id*.  Dr. Montilla testified that although he tried to provide "coaching" to Plaintiff on these issues, "it would go in one ear and out the other. . . . She continued with the same behavior. It would not change."  *Id*. at 21:25-22:14.

In an effort to turn things around with Plaintiff, Defendants made accommodations for her. For example, Defendants gave her more assistants, DSOF ¶ 21, and removed another doctor from the office at Plaintiff's request in an effort "to give her more touches with patients and give her more opportunity."  Montilla Dep. at 46:4-24.  Despite these efforts, the overall performance of the Pompano Beach office did not improve and in fact declined; as of September 2017, that office was reporting a year-over-year revenue decline of 25.5 percent.  DSOF ¶ 27.  Due to the performance issues of Plaintiff and the Pompano Beach office as a whole, Dr. Montilla began advocating for Plaintiff's termination.  *Id*. ¶ 30.  Dr. Cruz agreed, and Defendants initiated a search for a dentist to replace Plaintiff.  *Id*. ¶¶ 30-31.

The decision to terminate Plaintiff was made by October 17, 2017.  Defendant asserts that this decision was made by October 3, 2017, but this is not clear from the record evidence.  On that date, an email exchange took place between Bradford M. Cabibi, a Doctor Recruitment Specialist in Sage Dental's Human Resources Department, and Puneet Mann, the regional Vice President of Operations, with Dr. Montilla also copied.  Ex. A, Aff. of Dr. Miguel Montilla [ECF No. 58-6] at 6-7.  Mann asked Cabibi if he had had "any luck with Dr. Danesh[pajouh]'s replacement" because he felt that Sage Dental "really need[ed] to make the change asap."  *Id*. at 7.  Cabibi responded:

"We can start interviewing younger doctors and ones that aren't necessarily rockstars in their career yet, but as you and Dr. Montilla know[,] to find someone who's great and actually wants to walk into that particular office with its issues will be a struggle and near impossible to find." *Id*. Dr. Montilla then chimed in: "Understand what we are up against but we need to look. Let's keep this at the top of the list." *Id*. at 6. Mann ended the conversation by saying: "Agree. If there is somebody great, maybe a bit younger, no harm in interviewing. But as Dr. Montilla said, please make this a priority." *Id*. Drawing all inferences in favor of Plaintiff as the non-movant, a reasonable juror could find that Sage Dental was contemplating replacing Plaintiff at this time but had not yet actually made the decision to terminate her.

However, by October 17, 2017, emails show that the decision had been made to hire Dr. Lisa Ma to replace Plaintiff, and the plan was to terminate Plaintiff the next day. DSOF ¶¶ 35-36. On October 18, 2017, Dr. Montilla met with Plaintiff to terminate her employment and to present her with a signed termination letter from Sage Dental. DSOF ¶ 37. Before Dr. Montilla was able to communicate the termination decision to Plaintiff, she informed him for the first time that she was pregnant, and consequently, Dr. Montilla—who had previously been unaware of Plaintiff's pregnancy[3]—did not communicate the termination decision to Plaintiff. *Id*. ¶ 38. Instead, the next

---

[3] Plaintiff attempts to raise an issue of fact as to the date her employers became aware of her pregnancy, insisting that she "share[d] the news of her pregnancy [in] early August [2017]. She was showing in September, so it was clear she was pregnant. By that point, she also had posted on Instagram regarding her gender reveal party, which was in September." PSOF at 9, ¶ 20. She does not specify those with whom she shared the news of her pregnancy, and the evidence shows that Dr. Cruz and Dr. Montilla both did not learn of Plaintiff's pregnancy until after the decision was made to terminate her on October 17. Cruz Dep. at 111:25-112:21; Ex. D, Aff. of Dr. Miguel Montilla [ECF No. 58-6] at 15. Plaintiff also admitted in her deposition that October 5, 2017 was "a few weeks before [she] told" Mr. Mann and Dr. Montilla that she was pregnant, Pl.'s Dep. at 238:11-18, and that she had no knowledge of whether Dr. Cruz knew she was pregnant before the decision was made to terminate her, *id*. at 218:10-219:7. Therefore, to the extent she claimed in her deposition that "[t]he entire company knew [she] was pregnant . . . in August[,]" *id*. at 25:24-26:7, such testimony does not create an issue of fact because it is based solely on speculation. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 n.9 (7th Cir. 2000) (explaining, in the context of a retaliation claim, that plaintiff's "subjective belief that her supervisors knew" about plaintiff's complaints regarding gender discrimination did "not create the factual dispute needed to ward off summary judgment.

day, October 19, 2017, Dr. Montilla recommended to CEO Joseph Garcia and Senior Vice President of Finance Kirk Sayler that Sage Dental transfer Plaintiff to the Parkland office rather than terminate her employment.  *Id.* ¶ 39.  Mr. Sayler called this an "interesting proposition" and asked, "we cannot or don't want to just terminate Danesh anymore?"  Ex. D, Aff. of Dr. Miguel Montilla [ECF No. 58-6] at 15.  Dr. Montilla replied: "She informed me yesterday that she is pregnant."  *Id*.  Dr. Cruz learned that Plaintiff was pregnant from Dr. Montilla shortly after Dr. Montilla heard the news from Plaintiff herself.  *Id.* ¶ 41.

On October 23, 2017, Plaintiff complained to Dr. Montilla that patients' protected health information was not being protected as required by the Health Insurance Portability and Accountability Act ("HIPAA"), which provides data privacy and security provisions for safeguarding medical information.  PSOF at 9, ¶ 22.  Specifically, Plaintiff complained that the office manager, Simin Kermani, was removing patient information from the computer system in violation of the law.  *Id*.

Shortly thereafter, on October 27, 2017, Plaintiff learned at a routine ultrasound that she was in preterm labor and needed an emergency surgery to save her pregnancy and her unborn child.  PSOF at 10, ¶ 28.  She underwent emergency surgery on October 30, 2017, and while she was recovering the next day, Plaintiff called Dr. Montilla, and told him that she needed bedrest after the surgery and would be out of work for several days.  *Id*. at 10-11, ¶¶ 28-29.  During that conversation, she inquired about taking FMLA leave, to which Dr. Montilla asked whether she had taken any vacation.  *Id*. at 11, ¶ 29.  Plaintiff said no, and Dr. Montilla told her that she did not need to apply for FMLA since her leave could count as her vacation.  Dep. of Sara Daneshpajouh

---

This bare assertion simply speculates as to what her supervisors knew[.]"); *Ingram v. Houston. Cnty. Bd. of Educ.*, No. 1:16cv316, 2017 WL 4017762, at *6 (M.D. Ala. Sept. 12, 2017) (speculation that it was "common knowledge" that plaintiff had filed an EEOC charge did not demonstrate that her employer knew about the charge, as was necessary for a retaliation claim).

[ECF No. 58-1] ("Pl.'s Dep.") at 46:18-25.  She was granted paid leave for the surgery and the recovery period, through November 3, 2017.  DSOF ¶ 32.

Plaintiff returned to work on November 6, 2017.  PSOF at 11, ¶ 30.  That morning, Dr. Montilla came to Plaintiff's office and told her that she was not meeting her numbers and that the company had decided to transfer her to the office in Parkland, Florida.  Pl.'s Dep. at 21:1-7.  Plaintiff testified—and the Court therefore accepts as true for purposes of this Motion—that the performance issues referenced in that meeting had not been previously discussed with Plaintiff.  PSOF at 11, ¶ 31.  The next morning, Plaintiff had another call with Dr. Montilla wherein she stated that a transfer to Parkland was a considerable demotion based on the smaller size, weaker financial performance, and dimmer overall prestige of the Parkland office.  *Id*. at 11, ¶¶ 33-34.  Dr. Montilla stated that he understood the transfer to Parkland was a demotion but told Plaintiff that "based on your current condition, it's best if you go to a slower office that's a lot less stressful, so Parkland is a really good option for you."  Pl.'s Dep. at 36:11-21.

Plaintiff accepted the transfer, but on November 9, 2017, Dr. Montilla returned to the Pompano Beach location with Mr. Mann and advised Plaintiff that she would not be transferred to the Parkland office and was being terminated because she was not profitable.  PSOF at 12, ¶ 36.  Following the 90-day notice period, her employment with Sage Dental ended on February 7, 2018.  DSOF ¶ 47.

In the weeks after being given notice of her termination, Plaintiff told colleagues that she was fired for economic reasons.  On December 11, 2017, she sent a text message to fellow Sage Dental dentist Dr. Chau Leminh: "Dude, by the way, I discovered why they fired me.  So I found out this idiot new girl who was hired for Pompano [a reference to Dr. Ma], she doesn't get paid on a percentage.  Her contract is salary only, $500 a day.  They were paying me 38 percent most

months and, of course, that's a lot more . . . than $10,000 base they are giving this dumb [replacement dentist]."  DSOF ¶ 49.  Dr. Leminh later said, "[s]ee it was def about money[.] Remember I told you that[,]" to which Plaintiff replied, "I'm still going to sue them and blame it on the pregnancy.  Their timing was fucking awful." *Id*. ¶¶ 49-50.

Also on December 11, 2017, Plaintiff texted a fellow Sage Dental employee named Alice: "So I found out today they are paying this [] new doctor 500$ a day no percentage lol so she is literally doing [undesirable] work for no actual compensation or possibility of bonus . . . Poor thing now I know what this whole thing was about I was getting paid too much money." *Id*. ¶ 49.  After Alice told Plaintiff that "Puneet [Mann] had told me mine was all about the money too[,]" Plaintiff replied, "Yap all about the god damn money . . . Not that this will help my case w[ith] the law suit (sic) but at least makes me feel a little better [because] I know now it wasn't ME[.]" *Id*. ¶ 50.

When asked about these messages at her deposition, Plaintiff testified that she only meant that money was one reason for her termination though "not [the] only reason."  Pl.'s Dep. at 221:18-24.  Plaintiff later stated in her Declaration that she does "not believe [she] was terminated for legitimate reasons or because [she] was earning too much especially since [she] later learned" of other dentists employed by Sage Dental who were not pregnant and remained employed by Sage Dental after she was terminated.  Decl. of Sara Daneshpajouh [ECF No. 64-1] ¶ 47.

Plaintiff commenced this lawsuit on October 30, 2019.  In her Amended Complaint [ECF No. 20], Plaintiff alleges that (1) Defendants discriminated against her on the basis of her pregnancy by threatening her with demotion and ultimately terminating her after learning that she was pregnant; and (2) that Defendants unlawfully retaliated against her by firing her after she complained that she was being demoted due to her pregnancy.  Plaintiff also alleges that Defendants violated her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

("FMLA"), and unlawfully terminated her in retaliation for inquiring about her rights under the FMLA. Finally, Plaintiff alleges that Defendants violated the Florida Private Sector Whistleblower's Act ("FWA"), Fla. Stat. §§ 448.102 *et seq.*, by firing her in retaliation for raising concerns about the protection of patient information under HIPAA.

## LEGAL STANDARD

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Further, when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added and citation omitted).

## ANALYSIS

The Court analyzes each count in Plaintiff's Amended Complaint in sequential order.

### I.   Count I – Pregnancy Discrimination

In Count I of her Amended Complaint, Plaintiff alleges that Defendants discriminated against her on the basis of her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. §§ 760.01 *et seq.*  Am. Compl. ¶¶ 35-43.  Because "decisions construing Title VII guide the analysis under" the FCRA, the Court considers the claims in tandem.  *Holland v. Gee*, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012) (citation omitted).

Title VII prohibits employment discrimination on the basis of sex.  42 U.S.C. § 2000e–2(a).  The Pregnancy Discrimination Act amended Title VII to provide that discrimination on the basis of sex includes discrimination "on the basis of pregnancy, childbirth or related medical conditions."  *Id*. § 2000e(k). "The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits."  *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).

The relevant provision of Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e–2(a).  "In other words, an employer is not permitted to take an 'adverse employment action' against an employee on the basis of his or her sex or pregnancy, as to do so would constitute illegal discrimination."  *Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 268 (11th Cir. 2009) (citation omitted).  Therefore, a plaintiff must demonstrate that she was the victim of an adverse employment action to obtain relief under Title VII's anti-discrimination clause. *Davis v. Town of*

*Lake Park, Fla.*, 245 F.3d 1232, 1235 (11th Cir. 2001), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

### A.  The Scope of Plaintiff's Discrimination Claim

In her Amended Complaint, Plaintiff alleges that she was subjected to two adverse employment actions because of her pregnancy: (1) being "threatened with a transfer and demotion" and (2) being "terminated from her employment."  Am. Compl. ¶ 39.  An employment action is only "adverse" if it results in "a *serious and material* change in the terms, condition, or privileges of employment[.]"  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (emphasis in original) (citation omitted).  However, to be actionable, an employment decision must actually be carried out.  Consequently, "the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action."  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001); *see also Araya v. Fulton-Dekalb Hosp. Auth.*, No. 1:08-CV-1732, 2009 WL 10664777, at *10 (N.D. Ga. Aug. 19, 2009) ("[W]here an employment action is rescinded or fails to take effect before an employee suffers a harm, the action is not an adverse employment action.") (citations omitted), *report and recommendation adopted*, 2009 WL 10664857 (N.D. Ga. Nov. 5, 2009).

Here, although the evidence indicates that a transfer to the Parkland office *would* have constituted a demotion and therefore an actionable adverse employment action, it is undisputed that such a transfer never actually took place.  For that reason, Plaintiff cannot state a claim for discrimination based on the threat of being demoted.  *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (holding that memo stating plaintiff's position would be eliminated and she would be demoted was not an adverse employment action because "as [the plaintiff] admit[ted], the threatened demotion never actually happened."); *see also Howard*, 605 F.3d at

1245 (holding that a phone call threatening plaintiff's job did not rise to adverse employment action because "nothing suggests, nor does [Plaintiff] argue . . . [Defendant] took any action—including termination, demotion, or even a reprimand—that could have seriously affected [plaintiff's] employment."); *Araya*, 2009 WL 10664777, at *10 (finding that an "unfulfilled threat is not an adverse employment action.") (citation omitted).  The only adverse employment action that can serve as the basis for Plaintiff's discrimination claim is her termination.

Discrimination claims brought under Title VII "are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  While these are "different theories of discrimination, as opposed to distinct causes of action[,]" the distinction is important because the two theories require different standards of analysis. *Id*. at 1235 n.4.[4]  A plaintiff does not need to set out which theory she is pursuing in her complaint and may raise a mixed-motives theory for the first time in a response to a motion for summary judgment. *EEOC v. TBC Corp.*, 532 F. App'x 901, 902-903 (11th Cir. 2013) (requiring only that plaintiff "argue that the 'case involved mixed motives at some point the proceedings'") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989)) (alterations omitted). Despite Plaintiff's deposition testimony that she thought she was terminated for financial reasons in addition to her pregnancy, she later stated in her Declaration that she does not believe she was terminated for financial reasons, and she pursues only a single-motive theory in her brief. *See* Am.

---

[4] An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, "was a motivating factor for" an adverse employment action, "even though other factors also motivated" the action. 42 U.S.C. § 2000e–2(m).  "In contrast, single-motive claims—which are also known as 'pretext' claims—require a showing that bias was the true reason for the adverse action." *Quigg*, 814 F.3d at 1235 (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 251–53 (1981)).  The most common framework used to evaluate single-motive claims is the well-known burden-shifting analysis under *McDonnell Douglas*, which is detailed below, but this analysis "is inappropriate for evaluating mixed-motive claims[.]" *Id*. at 1237.

Resp. in Opp. to Defs.' Mot. for Summ. J. [ECF No. 98] ("Resp.").[5]   Thus, the Court will analyze

Plaintiff's claims only under the single-motive theory of liability.   *See, e.g.*, *Luna v. Corr. Corp.*

*of Am.*, No. 6:09-CV-084-C, 2011 WL 13177718, at *3 (N.D. Tex. May 11, 2011) ("[T]he Court

will not undertake a mixed-motives analysis . . . because that argument could have been, but was

not, raised in Plaintiff's response to Defendant's motion for summary judgment.").

### B.  Legal Frameworks

Discrimination can be proven through direct or circumstantial evidence.  *Hinson v. Clinch*

*Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000).  Direct evidence is "evidence that, if

believed, proves the existence of a fact without inference or presumption.  Only the most blatant

remarks whose intent could mean nothing other than to discriminate on the basis of some

impermissible factor constitute direct evidence of discrimination."  *Holland*, 677 F.3d at 1055

(citation and alteration omitted).

In cases where there is no direct evidence of discrimination, there are two principal ways

in which a plaintiff may establish such intent through circumstantial evidence.  The first, and most

common, is by using the burden-shifting framework under *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  As explained by the Eleventh Circuit:

---

[5]  In her Response, Plaintiff "does not argue that she is bringing her claims under a 'mixed-motive' theory
of liability nor does she cite the Court to the relevant mixed-motive case law."  *Herren v. La Petite Academy,*
*Inc.*, No. 16-01308, 2019 WL 2161250, at *10 n.11 (N.D. Ala. May 17, 2019) (refusing to address a mixed-
motive theory of discrimination), *aff'd in relevant part*, 820 F. App'x 900, 904-905 (11th Cir. 2020).
Plaintiff does state in one case citation parenthetical that summary judgment is properly denied where
"direct evidence raises issues of fact whether 'gender played a motivating part in the defendants' decision
to refuse to hire her for the director position.'"  Resp. at 2 (citing *Burns v. Gadsden State Cmty. Coll.*, 908
F.2d 1512, 1518 (11th Cir. 1990)).  To the extent that Plaintiff is attempting to use this one cite to advance
a mixed-motives theory, the Court finds that it provides Defendants and the Court insufficient notice that
she is pursuing such a theory given her reliance throughout the rest of her brief on single motive case law.
*See Keaton v. Cobb Cty., Ga.*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009) ("Our case
law regarding waiver suggests that [plaintiff's] single, passing reference to a 'mixed motive' theory . . . was
not sufficient to preserve the issue for appeal."); *Herren*, 2019 WL 2161250, at *10 n.11.

> When proceeding under *McDonnell Douglas*, the plaintiff bears the
> initial burden of establishing a *prima facie* case of discrimination by
> showing (1) that she belongs to a protected class, (2) that she was
> subjected to an adverse employment action, (3) that she was
> qualified to perform the job in question, and (4) that her employer
> treated "similarly situated" employees outside her class more
> favorably.  If the plaintiff succeeds in making out a *prima facie* case,
> the burden shifts to the defendant to articulate a legitimate,
> nondiscriminatory reason for its actions.  Finally, should the
> defendant carry its burden, the plaintiff must then demonstrate that
> the defendant's proffered reason was merely a pretext for unlawful
> discrimination, an obligation that merges with the plaintiff's
> ultimate burden of persuading the factfinder that she has been the
> victim of intentional discrimination.

*Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc) (internal

citations and quotations omitted).

However, the *McDonnell Douglas* framework "is not, and never was intended to be, the

*sine qua non* for a plaintiff to survive a summary judgment motion."  *Smith v. Lockheed-Martin

Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Therefore, if the *McDonnell Douglas* path is

foreclosed, a plaintiff may nevertheless survive summary judgment if she can "present

circumstantial evidence that creates a triable issue concerning the employer's discriminatory

intent."  *Johnson v. Airbus Def. & Space Inc.*, No. 20-11424, --- F. App'x ---, 2021 WL 2134862,

at *6 (11th Cir. May 26, 2021) (citing *id.*).  Under the *Smith* framework, "a triable issue of fact

exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic

of circumstantial evidence that would allow a jury to infer intentional discrimination by the

decisionmaker."  *Id.* (alterations omitted).

### C.  Application

#### i)  Direct Evidence

Plaintiff argues that there are two pieces of direct evidence for her discrimination claims.

She first points to comments from the office manager, Simin Kermani, that Plaintiff "better not

get pregnant soon" because "the office needs to keep making money."  Resp. at 2.  However, Plaintiff admits that Ms. Kermani "was not a decisionmaker" with respect to Plaintiff's termination, *id.*, which means her comment is not direct evidence that the termination decision was discriminatory.  *See Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (finding that the "discriminatory comment" of an employee was "not direct evidence of a discriminatory motive with respect to Appellant's claims of failure to promote or discriminatory discharge . . . [a]s [the employee] was not a decisionmaker with respect to either of these employment decisions.") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).  The other piece of supposedly direct evidence offered by Plaintiff is Dr. Montilla's comment that given her condition (presumably referring to her having a pregnancy with complications), the transfer to Parkland was a good thing.  Resp. at 2.  But this is only directly relevant to the threat of transfer, which is not the adverse employment action at issue for the reasons explained above.   Therefore, the record is devoid of any direct evidence showing that Plaintiff was terminated because she was pregnant.

### ii)   *Circumstantial Evidence*

Lacking direct evidence, Plaintiff must rely on circumstantial evidence to establish her discrimination claims, but Plaintiff has not shown an issue of fact in this way either.[6]

---

[6]  It is difficult to determine the theory of liability Plaintiff seeks to rely on to establish her claim with circumstantial evidence.  As explained above, she can either use the burden-shifting framework under *McDonnell Douglas* or she can attempt to demonstrate a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination.  But Plaintiff does not make clear which approach she is proceeding under and seems to conflate the two.  For example, after stating that she is proceeding under a "convincing mosaic" framework, Plaintiff lists the elements necessary to establish a *prima facie* case under *McDonell Douglas*—without invoking that framework by name or ever mentioning "burden-shifting."  Resp. at 2-3.

To be sure, this confusion is somewhat understandable given that some courts have observed that it is an "open question in the Eleventh Circuit whether [the convincing mosaic theory under] '*Smith* only provides an alternative way to establish a *prima facie* case rather than an alternative analytical framework to *McDonnell Douglas*.'"  *Huddleston v. Bowling Green Inn of Pensacola, LLC*, No. 3:19-cv-1545, 2020 WL

a. _McDonnell Douglas_

Plaintiff fails to establish a _prima facie_ case under _McDonnell Douglas_ because she has not raised an issue of fact as to whether her employer treated "similarly situated" employees outside her class more favorably.  On this fourth prong of the _prima facie_ test, a plaintiff must show that "she was treated differently from another 'similarly situated' individual—in court-speak, a 'comparator.'"  _Lewis_, 918 F.3d at 1217 (citation omitted).  This means a plaintiff must "demonstrate that she and her proffered comparators were similarly situated in all material respects."  _Id_. at 1218.  "This requirement poses a substantial hurdle for a plaintiff with a record of job-related performance issues, because the plaintiff must identify comparators with records of similar problems at least as severe as his own."  _Hamilton v. Sheridan Healthcorp, Inc._, No. 13-62008, 2014 WL 2177798, at *5 (S.D. Fla. May 25, 2014) (citing _Embry v. Callahan Eye Found. Hosp._, 147 F. App'x 819, 829–30 (11th Cir. 2005)).

Plaintiff offers as her comparators the 11 dentists who worked under Dr. Montilla in Plaintiff's region because, Plaintiff avers, "[a]ll were general dentists, with the same education and

---

7296511, at *7 n.12 (N.D. Fla. Nov. 10, 2020) (quoting _King v. Ferguson Enter., Inc._, 568 F. App'x 686, 689 (11th Cir. 2014)).  However, the en banc Eleventh Circuit clearly answered this question in _Lewis_, when it explained that "[o]ne way" a plaintiff can raise an issue of fact as to intentional discrimination "is by satisfying the burden-shifting framework set out in _McDonnell Douglas_" and "[a] plaintiff can also . . . demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." 918 F.3d at 1221, 1221 n.6. After the en banc court addressed the plaintiff's discrimination claims under _McDonnell Douglas_, the subsequent _Lewis_ panel was left to address the plaintiff's "convincing mosaic" theory, and that panel reiterated that "establishing the elements of the _McDonnell Douglas_ framework is not, and never was intended to be, the _sine qua non_ for a plaintiff to survive a summary judgment motion in an employment discrimination case." _Lewis v. City of Union City, Ga._, 934 F.3d 1169, 1185 (11th Cir. 2019). "Accordingly, a 'plaintiff will always survive summary judgment if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" _Id_. (quoting _Smith_, 644 F.3d at 1328) (alterations omitted).  If the convincing mosaic was only a way to establish a _prima facie_ case under _McDonnell Douglas_—i.e., if that only satisfied step one of the burden-shifting analysis—then a plaintiff would not "always survive summary judgment" by presenting a convincing mosaic, _id._, since a plaintiff would still need to get past the final two steps in the analysis. Therefore, it is clear that they are different analyses altogether, and because it appears Plaintiff is attempting to try her hand at each, the Court will assess Plaintiff's claims under both the _McDonnell Douglas_ and "convincing mosaic" analyses.

training, and all were expected to perform the exact same duties, reporting to Dr. Montilla.  Further, all were judged according to the same metrics i.e., number of patients seen, production per day, revenue per patient, doctor days."  Resp. at 2.  These dentists were not "similarly situated" to Plaintiff, though, because she has not shown that these dentists had "similar histories of disciplinary and job-performance issues."  *Hamilton*, 2014 WL 2177798, at *5.

Specifically, there is nothing in the record indicating that these other dentists had similar histories of interpersonal conflicts or similarly poor performance metrics.  The record shows that there were multiple contemporaneously-documented instances of Defendants taking issue with Plaintiff's negative interactions with patients and coworkers, which Defendants felt was impacting the overall performance of the Pompano Beach office.  DSOF ¶ 15, 18, 23, 25.  But there is nothing in the record indicating any interpersonal issues whatsoever with any of the other dentists (save for Dr. Mastali[7]).

Likewise, Defendants have provided evidence showing that among the 11 dentists that Plaintiff asserts were her comparators, Plaintiff's burn rate (meaning the percentage of patients who did not return after their first visit) was the second worst; her patient retention rate (meaning the percentage of overall patients who returned) was the worst; and her treatment acceptance rate of 84.2% (meaning the percentage of treatment presented to the patient that the patient accepted) was also the worst.  DSOF ¶ 26.  Plaintiff attempts to show that her comparators performed worse by losing more overall patients (essentially looking only at the numerator in the overall equation).

---

[7]  There is evidence that Dr. Farid Mastali, a dentist at the Parkland office, had worse interpersonal issues than Plaintiff.  In his email to the CEO in which he recommended transferring Plaintiff to the Parkland office in lieu of terminating her, Dr. Montilla stated: "Parkland is much smaller so we can deal with her better there and frankly we cannot do any worse than Mastali who is at odds with staff and vice versa."  Ex. D, Aff. of Dr. Miguel Montilla [ECF No. 58-6] at 15.  But Dr. Montilla recommended firing Mastali, and this response is consistent with Defendants' proffered explanation for terminating Plaintiff given her performance and interpersonal issues.  *See id.* ("With Mastali I believe we can terminate him due to the APD clause which he is not meeting.").

Resp. at 4.  But Defendants testified—and Plaintiff did not rebut—that the metric they relied on at the time was the *rate* at which patients were lost, not the aggregate total number of patients lost. Cruz Dep. at 53:4-54:2.

Further, while Plaintiff insists that the treatment acceptance rate—a concern which Defendants flagged to Plaintiff on multiple occasions—involved many factors outside her control, that does not prevent Defendants from being able to make an employment decision based on *their* belief of the cause of the problem.  For other employees to be "similarly situated," the record would need to show that they had similar performance issues in the eyes of Defendants.  *See, e.g.*, *Penaloza v. Target Corp.*, No. 8:11–cv–2656–T–33AEP, 2012 WL 6721011, at *9 (M.D. Fla. Dec. 27, 2012) (finding that plaintiff did not establish a valid comparator because she "ha[d] failed to present any evidence of other employees whom Target accused of failing to call before an unscheduled absence—*regardless of whether or not that accusation was accurate or if the employee disputed it*—who were reprimanded differently than [plaintiff], or who were not reprimanded at all.") (emphasis added), *aff'd*, 549 F. App'x 844 (11th Cir. 2013); *accord Lewis*, 918 F.3d at 1213 (rejecting a more lenient standard for establishing a comparator because it would "risk giving courts too much leeway to upset employers' valid business judgments").

While Plaintiff's proffered comparators might have had similar jobs, the record does not show that they had similar performance issues or documented problems with their interpersonal interactions.  For that reason, Plaintiff has not shown that Defendants treated similarly situated non-pregnant employees more favorably, and therefore she has failed to establish a *prima facie* case under *McDonnell Douglas*.  *See Knight v. Baptist Hosp. of Mia., Inc.*, 330 F.3d 1313, 1318 (11th Cir. 2003) (finding plaintiff and her proffered comparator were not similarly situated because plaintiff's "documented performance [] problems were much worse than [the comparator]'s in both

number and nature"); *Reilly v. Novartis Pharm. Corp.*, No. 6:07-cv-230-Orl-19GJK, 2008 WL 795322, at *5-8 (M.D. Fla. Mar. 24, 2008) (finding comparators not similarly situated because the evidence showed that the plaintiff pharmaceutical saleswoman, unlike her comparators, had "interpersonal problems with peers and physicians [that] had begun to impact negatively on her sales performance").

### b. "Convincing Mosaic"

Plaintiff's "failure to produce a comparator does not necessarily doom [her] case." *Smith*, 644 F.3d at 1328. Instead, she may establish a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker by pointing to evidence such as (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly-situated employees, and (3) pretext. *Lewis*, 934 F.3d at 1185. However, no such evidence exists here to create an issue of material fact as to whether Plaintiff was fired because she was pregnant.

"When undertaking a convincing mosaic analysis, the Court first considers whether [Defendants'] cited reasons for firing [Plaintiff] are merely a pretext for discrimination." *Key v. Cent. Ga. Kidney Specialists, P.C.*, No. 19-00253, 2020 WL 7053293, at *6 (M.D. Ga. Oct. 28, 2020). The pretext inquiry requires Plaintiff to "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Critically, though, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (citation omitted). And since this is a single motive case,

Plaintiff "bears the burden to show that 'but for' her pregnancy, [Defendants] would not have fired her[.]" *Key*, 2020 WL 7053293, at *6.

Defendants argue that they fired Plaintiff because of continued clinical deficiencies and challenges with her interpersonal skills, which—at least in their view—contributed to the poor financial performance of their Pompano Beach office.  Plaintiff first argues that Defendants have provided shifting justifications over time, which is indicative of pretext.  It is true that "[a] plaintiff may establish pretext by demonstrating that the employer has offered inconsistent reasons for the challenged employment action." *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 872 (11th Cir. 2011) (citing *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998)).  But this is not the case here, and the Court finds Plaintiff's arguments in this regard puzzling, if not disingenuous.

According to Plaintiff, Defendants toggled between justifying her termination based on her interpersonal problems and her performance issues, which should raise an inference of pretext. Resp. at 6.  But Defendants have consistently maintained that these two justifications were *both* reasons for her termination and in fact were interrelated in that Plaintiff's abrasiveness led to performance issues that affected the overall financial performance of the Pompano Beach office, since she was either the only dentist in that office or one of two.  *See* Cruz Dep. at 199:22-200:12 ("I know you're focusing on burn rate and obviously that's important, but when we talk about termination, as far as Dr. Danesh, you have to take the burn rate in the context of everything else that I told you, the way she treated people, the way she treated patients, the way she treated staff clinically.  So, even if she had a bad burn rate like that and that's the only thing, she probably would have still been here.  But when you look at that in the context of all the things that I told you today, in terms of her behavior, in terms of her not being a team player, when you take all that, that's why she's not here today."); Montilla Dep. at 56:23-57:3 (explaining that Plaintiff was

"terminated because all the continuing problems that we experienced with patients, the lack of acceptance, the lack of her empathy for patients, her selfishness when looking at patients, all the issues . . . that we discussed with her."); Dep. of Puneet Mann [ECF No. 58-8] at 34:20-25 (explaining that Plaintiff was terminated because "she was way too aggressive on the patients and not thinking about the patients but thinking of them as dollar signs and just being very aggressive in their treatment.  That led to low retention rate and the practice declined over the time she was there.").  "[T]he fact that the employer offers an additional reason for the employment decision does not suggest pretext if both of the employer's reasons are consistent." *Ritchie*, 426 F. App'x at 872.  And an employer's further elaboration of a general reason is not evidence of pretext. *Faircloth v. Herkel Invs., Inc.*, No. 5:10–CV–352, 2012 WL 2119083, at *10-11 (M.D. Ga. June 11, 2012).

Plaintiff next contends that Defendants' justifications are pretextual because they are unsupported by the record.   As support, she attempts to argue the merits of her job performance, maintaining that she was productive, any issues were also the fault of staff, and she was well-received by her patients. *See, e.g.*, Resp. at 6-9; PSOF at 7, ¶ 8.  First, as explained above, Plaintiff cannot recast the truthfulness or meaning of the statistics relied on by Defendants by looking to aggregate numbers instead of percentages, since the unrebutted evidence is that Defendants looked to the latter, not the former.

More importantly, "the fact that she thinks more highly of her performance than her employer does is beside the point.  The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Courts are specifically instructed "not to allow Title VII plaintiffs simply to litigate whether they

are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002).  Thus, "[t]he question is not whether it really was [Plaintiff]'s fault that [the performance of the office was suffering], or whether she did [have performance issues], or whether she was aggressive and rude to her colleagues. . . . The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those [issues] about [Plaintiff] as cover for discriminating against her because of her [pregnancy]." *Alvarez*, 610 F.3d at 1266.

Apart from arguing that she was a good employee and productive dentist, Plaintiff has pointed to no evidence in the record showing that Defendants did not subjectively believe that Plaintiff was not performing to their expectations and was contributing to the decline of the Pompano Beach office.  Conversely, Defendants have provided testimony and contemporaneous documents and correspondence showing that their decision-makers thought negatively of Plaintiff's performance throughout the relevant time period.  Whether that belief was correct on the merits is irrelevant.  "We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Id*. (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)).  Nor does it matter, as Plaintiff suggests, that Defendants did not style their meetings with Plaintiff regarding her negative performance as formal discipline.  "Even assuming that Defendants' [representatives] were ineffective in communicating with Plaintiff the expectations of her role and in helping her succeed in growing their business, Plaintiff has not refuted the fact that her supervisors viewed her job performance as poor[.]" *Mohammed v. Jacksonville Hospitalists, P.A.*, 712 F. App'x 872, 879 (11th Cir. 2017) (citing *id*.).

Even if she could show that Defendants' reasons were "ill-founded," that would not be enough, as "she must also show unlawful discrimination [based on her pregnancy] was the true reason." *Id*. at 1267. Plaintiff seems to believe that the temporal proximity between her emergency surgery and her termination is enough to create an issue of fact. *See* Pl.'s Dep. at 238:1-10 ("They could have terminated me before I was pregnant and I was so horrible. Why when I'm pregnant? Why did they fire me when I had just undergone very, very intense surgery to save my pregnancy? That's my question."). "While temporal proximity may be evidence of pretext, such evidence alone is insufficient to survive summary judgment." *Mohammed*, 712 F. App'x at 880 (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). "Further, temporal proximity arguments fall short when legitimate, nondiscriminatory reasons for the termination remain undisputed." *Key*, 2020 WL 7053293, at *7 (citations omitted).

Even when considered alongside the only other evidence Plaintiff offers—the comments of Ms. Simini and Dr. Montilla—the temporal proximity between her informing her superiors of her pregnancy (or her surgery) and her termination does not show that Defendants' proffered reasons are pretextual. Given that Defendants had questioned Plaintiff's job performance long before her pregnancy and indeed had been contemplating her termination before being informed of the pregnancy, this evidence does not rebut Defendants' legitimate reasons for deciding to terminate her. *Mohammed*, 712 F. App'x at 880 (finding that temporal proximity and pejorative pregnancy-related comments did not show pretext where the plaintiff "had demonstrated unsatisfactory job performance up to that point, and the company had questioned the financial viability of her job position, given her sub-par performance.")[8]; *Huddleston v. Bowling Green Inn*

---

[8] *Mohammed* involves strikingly similar facts to the instant case. There, the plaintiff informed her employer doctor that she was pregnant, and he responded by saying, "F**k. What are we going to do? This sucks. Are you going to be able to do your job?" *Mohammed*, 712 F. App'x at 876. When another doctor learned of the plaintiff's pregnancy, he stated, "That means she's going to do a worse job." *Id*. Further, one of the

*of Pensacola, LLC*, No. 3:19-cv-1545, 2020 WL 7296511, at *7 n.12 (N.D. Fla. Nov. 10, 2020) (finding that "any inference of intentional discrimination that could be drawn based on the temporal proximity between [plaintiff's] termination and her pregnancy announcement (seven weeks) or subsequent request for accommodations (three weeks) is undercut by the overwhelming evidence that [plaintiff] was terminated due to her poor performance as a manager[,]" including the fact that plaintiff's employer "initially identified [plaintiff's] deficient job performance well before learning that she was pregnant.") (citations omitted); *Key*, 2020 WL 7053293, at *8 ("[W]hen she told her employer that she was pregnant, she did not wipe away her significant history of [performance issues].").

Viewing the record evidence in the light most favorable to Plaintiff, the Court does not find that Plaintiff has offered sufficient evidence of "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328. "Because Plaintiff has failed to rebut the non-discriminatory reasons for her termination, a jury cannot reasonably conclude from the facts here that her termination was based only on her pregnancy." *Mohammed*, 712 F. App'x at 880.

Accordingly, Defendants are entitled to summary judgment on Count I.

## III.   Count II – Retaliation

In Count II of her Amended Complaint, Plaintiff alleges that she was terminated after she complained that her transfer to the Parkland office was a demotion imposed on her because she

---

doctors testified that he had concerns about plaintiff's performance from "very early on," and there were plans to fire her before she announced her pregnancy. *Id.* Moreover, as here, the board of directors "expressed concern about the ramifications of firing a pregnant employee," but testified that the decision was made based on her inadequate performance. *Id.* The Eleventh Circuit concluded that, "[p]laintiff has not refuted the fact that her supervisors viewed her job performance as poor, nor has Plaintiff shown that concern about her allegedly poor performance was merely a pretext, with discrimination being the real reason for her termination." *Id.* at 879.

was pregnant.  Am. Compl.  ¶ 46-49.  She argues that constitutes unlawful retaliation in violation of Title VII and the FCRA.  "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law claims do not need separate discussion and their outcome is the same as the federal ones."  *Alvarez*, 610 F.3d at 1271 (internal citation omitted).

Employers may not retaliate against an employee for complaining about sex discrimination in the workplace.  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . .").  "A claim for retaliation under Title VII that relies on circumstantial evidence, such as this one, follows the same *McDonnell Douglas* burden-shifting analysis that applies to Title VII discrimination cases." *Clark v. Bd. of Regents of Univ. Sys. of Ga.*, 243 F. Supp. 3d 1367, 1375 (S.D. Ga. 2017) (citing *Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010)).

Pursuant to that framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that: (1) she engaged in statutorily protected conduct (i.e., conduct protected by Title VII); (2) she suffered an adverse action; and (3) "there is some causal relationship between the two events."  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).  "The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action. Assuming the employer's burden is met, the burden shifts back to the plaintiff to establish that the reason offered by the employer was not the real basis for the decision, but a pretext for retaliation." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021) (internal citations and quotations omitted).

Assuming Plaintiff engaged in statutorily protected conduct,[9] Plaintiff's retaliation claims fail because she does not show a causal connection between her complaint that her threatened demotion was because of her pregnancy and her ultimate termination.  Plaintiff relies on the close temporal proximity to meet the causation element, leaning exclusively on the fact that she was terminated within two days of her complaint to Dr. Montilla.  However, "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).

Defendants' relevant decision-makers discussed terminating Plaintiff in emails as early as October 3, 2017—well before any of them were aware of Plaintiff's pregnancy.  *See* n.3, *supra*. While Plaintiff goes to great lengths to establish that the final decision to terminate her was not made until early November—after she had complained that her threatened demotion was discriminatory—that is irrelevant because Defendants clearly *contemplated* such a decision.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment decisions] upon discovering that [a plaintiff had engaged in statutorily protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) ("When an employer makes a tentative decision

---

[9] To establish statutorily protected conduct under Title VII's opposition clause, a plaintiff must "show that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Howard*, 605 F.3d at 1244 (citation and alterations omitted).  He must demonstrate "that he subjectively believed that [the defendant] engaged in unlawful discrimination and that his belief was objectively reasonable in light of the facts and record present." *Id*.  A plaintiff "need not prove that the conduct he opposed was actually unlawful, but the reasonableness of his belief that [the defendant] engaged in an unlawful employment practice must be measured against existing substantive law." *Id*. (internal quotation omitted).

*before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation.") (emphasis in original). Accordingly, Plaintiff cannot establish the necessary causal link between her protected activity and the adverse employment action. *See also Slater v. Energy Servs. Grp. Intern. Inc.*, 441 F. App'x 637, 642 (11th Cir. 2011) ("[T]he close temporal proximity between [plaintiff's complaint about potential pregnancy discrimination] and her termination did not create a causal link between the two because the record shows that [plaintiff]'s supervisor had already contemplated [plaintiff]'s termination.").

Even if the Court were to credit Plaintiff's version of events and assume that everyone in the company knew of her pregnancy in August, Plaintiff's retaliation claims would still fail because she would be unable to show that Defendants' legitimate, non-discriminatory reasons for terminating her were pretext. At this stage of the inquiry, the employee must prove that retaliation was the but-for cause of the employment action. *Tolar*, 997 F.3d at 1294 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." *Id*. For the reasons explained above, Plaintiff does not rebut that Defendants believed that Plaintiff was performing her job unsatisfactorily and thus is unable to show that but for her complaint to Dr. Montilla, she would not have been fired.

Accordingly, Defendants are entitled to summary judgment on Count II.

## IV.    Count III – FMLA Interference

The FMLA grants an eligible employee the right to take up to 12 weeks of unpaid leave annually for several reasons, including "a serious health condition" that prevents the employee from performing the functions of her position. 29 U.S.C. § 2612(a)(1). After the completion of FMLA qualified leave, eligible employees have the right "to be restored by the employer to the

position of employment held by the employee when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1). "To preserve and enforce these rights, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . .[,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (alterations in original) (quotation marks and quotation omitted).   Plaintiff advances both types of claims in her Amended Complaint.

To establish an FMLA interference claim, Plaintiff must demonstrate that she was (1) entitled to a benefit under the FMLA; (2) was denied that benefit by Defendants, *id.* at 1268; and (3) that she "has been prejudiced by the violation in some way," *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).  In Count III, Plaintiff alleges that Defendants interfered with her rights under the FMLA in three ways: (1) by failing to provide her with information regarding her FMLA rights when she inquired about taking such leave because of her own serious medical condition; (2) by discouraging her from taking such FMLA leave to which she was entitled; and (3) by disclosing her personal and private medical information to staff and her patients.  Plaintiff has raised a question of fact only as to the first, but even as to that alleged violation, Plaintiff is unable to show prejudice.

### A.  The FMLA Benefits

Plaintiff has raised a question of fact that Defendants denied her an FMLA right to which she was entitled by failing to provide her information about her eligibility about the FMLA. "When an employer acquires knowledge that an employee's leave may be for an FMLA-qualifying

reason, that triggers the employer's obligation to evaluate whether the employee's requested absence in fact qualifies for FMLA protection." *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1243 (11th Cir. 2021) (citation omitted).   The employer must also provide notice to the employee of her eligibility for and rights under the FMLA within a certain timeframe. *See* 29 C.F.R. § 825.300.  A "[f]ailure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."  *Id*. § 825.300(e).   To meet the eligibility notice requirement, "an employer must advise its employee of her 'eligibility to take FMLA leave within five business days, absent extenuating circumstances.'" *Id*. § 825.300(b)(1).  Thus, because Dr. Montilla told Plaintiff that she did not need to apply for FMLA leave and nothing in the record indicates that Plaintiff was provided information about her eligibility for FMLA leave, she has raised an issue of fact as to whether she was denied that benefit under the FMLA.

However, it was not an FMLA violation for Dr. Montilla to tell Plaintiff that she did not need to apply for FMLA leave since her leave could count as vacation.   Under the FMLA, an employer may require an employee to substitute paid leave for any part of the 12–week FMLA entitlement.  29 U.S.C. § 2612(d)(2)(A).  Thus, paid leave may "run concurrently with the unpaid FMLA leave."  29 C.F.R. § 825.207(a); *see also Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1205 (11th Cir. 2001) ("[A]n employer who is subject to the FMLA and also offers a paid sick leave policy has two options when an employee's leave qualifies both under the FMLA and under the employer's paid leave policy: the employer may either permit the employee to use his FMLA leave and paid sick leave sequentially, or the employer may require that the employee use his FMLA leave entitlement and his paid sick leave concurrently.").

The record establishes that Defendants' leave policy required employees to take paid time off concurrently with FMLA leave.  Plaintiff was provided a copy of Defendants' employee handbook, Pl.'s Dep. at 119:11-120:8, which states: "When FML is taken, and in keeping with applicable law, SAGE Dental will first substitute for unpaid leave any accrued paid leave (e.g., PTO), which time will be charged against the employee's outstanding FML entitlement."  [ECF No. 58-6] at 26.  Thus, Plaintiff was aware of Defendants' policy requiring that vacation time could and would be used alongside any FMLA leave.  In any event, Defendants "had the statutory right to count [Plaintiff]'s leave against her twelve-week FMLA guarantee and [were] not obligated to notify her in advance that [they] would exercise that right." *Dixon v. Pub. Health Trust of Dade Cnty.*, 567 F. App'x 822, 826 (11th Cir. 2014) (citing *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999); *Strickland*, 239 F.3d at 1205); *see also Downs v. Mr. Burch Formal Wear, Inc.*, No. 2:13–cv–365, 2014 WL 4264849, at *7 (N.D. Ala. Aug. 27, 2014) ("Under the precedent in the Eleventh Circuit, Defendants had the statutory right to count [plaintiff]'s leave against his twelve-week FMLA guarantee and [were] not obligated to notify him in advance that it would exercise that right.  Simply put, the FMLA guaranteed [plaintiff] a total of twelve weeks of leave and no more. How Defendants characterized [plaintiff]'s leave is irrelevant and whether Defendants told him how they were characterizing his leave is irrelevant as well.") (internal citations omitted).

Finally, Plaintiff asserts that Defendants "disclosed her private and personal medical information to her patients and staff, including information about her surgery and complicated and high-risk pregnancy."  PSOF at 15 ¶ 47.  It is currently an open question among district courts whether disclosure of an employee's medical information standing alone constitutes an interference claim under the FMLA. *Compare, e.g., Jones v. Velocity Tech. Sols. LLC*, No. 2:19-

cv-2374, 2020 WL 4430636, at *5 (E.D. Cal. July 31, 2020) (dismissing plaintiff's interference claim because "plaintiff does not allege that the disclosure of his medical condition interfered with, or deterred him from, exercising his rights under the FMLA."), *report and recommendation adopted*, 2020 WL 5909058 (E.D. Cal. Oct. 6, 2020), *with, e.g.*, *Sanchez v. City of Pembroke Pines, Fla.*, No. 16-62958, 2017 WL 5068370, at *12 (S.D. Fla. Nov. 3, 3017) ("Since a reasonable employee might be dissuaded from seeking FMLA leave if the employee knew the City might reveal details of the medical reasons for the leave to other co-workers, and material issues of fact exist regarding whether the City released [plaintiff]'s medical information and whether [plaintiff] made statements to his co-workers regarding his leave, summary judgment is inappropriate."). The Court need not weigh into that conflict, however, because Plaintiff's only factual support for this assertion is a conclusory allegation in her Declaration, which—assuming that the disclosure of private medical information violates the FMLA—is insufficient to create an issue of fact.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc) (recognizing that a nonmovant's affidavit in opposition to summary judgment "cannot be conclusory").

### B. Prejudice

Even though Plaintiff has raised an issue of fact as to whether she was denied an FMLA benefit by not being provided information on her FMLA eligibility, summary judgment is still due to be granted to Defendants because Plaintiff has not provided any evidence that she was prejudiced by that violation (or any of her claimed violations).  The FMLA provides that an employer who violates the non-interference provisions of 29 U.S.C. § 2615 "shall be liable to any eligible employee affected . . . for damages . . . and . . . for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1).  The Supreme Court has explained that the FMLA provides no relief unless the employee has been

prejudiced by the violation: "The employer is liable only for compensation and benefits lost by reason of the violation, . . . for other monetary losses sustained as a direct result of the violation, . . . and for appropriate equitable relief." *Ragsdale*, 535 U.S. at 89 (citations and internal quotation marks omitted); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) ("Even if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages.").

Plaintiff has shown no injury that could be remedied by damages or equitable relief. For starters, she admits that she was given all the leave she requested; she just takes issue that it was characterized as vacation instead of FMLA leave. "[A] plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it." *Id*. at 1275. She also claims she suffered "damages, including, but not limited to, emotional stress, pain, suffering, mental anguish and other non-pecuniary losses, including damage to her professional reputation." Resp. at 13. But such damages are not cognizable under the FMLA. *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1277 (10th Cir. 2001) ("Because recovery is [] unambiguously limited to actual monetary losses, courts have consistently refused to award FMLA recovery for such other claims as consequential damages and emotional distress damages.") (collecting cases); *Graham*, 193 F.3d at 1284 ("[T]he FMLA does not allow recovery for mental distress or the loss of job security."); *Billups v. Tampa Sports Auth.*, No. 8:06-cv-1433, 2007 WL 4093232, at *9 (M.D. Fla. Nov. 15, 2007) ("[T]he FMLA provides for neither emotional distress damages nor nominal damages, and equitable relief is not appropriate in the absence of an FMLA injury."). And even if they were, "Plaintiff here presented no quantifiable, specific, or tailored information about the harm she suffered" by the alleged interference with her FMLA rights, precluding any showing of prejudice. *Graham v. Fanatics Retail Grp. Fulfillment, LLC*, No. 3:19-cv-1358, 2021 WL

2868463, at *7 (M.D. Fla. June 16, 2021).  "Because [Plaintiff] provided no evidence supporting her conclusory allegations of prejudice, the Court, even when drawing all inferences favorable to her, can identify no prejudice in which she suffered that may be remedied by damages or equitable relief."  *Id.* (citing *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014)).

Accordingly, Defendants are entitled to summary judgment on Count III.

## V.     Count IV - FMLA Retaliation

In Count IV, Plaintiff alleges that her termination was carried out in retaliation for inquiring about her rights under the FMLA.  Am. Compl. ¶¶ 64-74.  To establish an FMLA retaliation claim, Plaintiff "must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  *Strickland*, 239 F.3d at 1207.  The Eleventh Circuit has made clear that courts "evaluate retaliatory-discharge claims under [the FMLA] employing the burden-shifting framework we use to assess retaliation claims in Title VII cases."  *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021).  Therefore, in FLMA retaliation cases, as in Title VII retaliation cases, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."  *Salem v. City of Port St. Lucie*, 788 F. App'x 692, 696 (11th Cir. 2019) (citation omitted).

Plaintiff relies on the same evidence to establish her FMLA retaliation claims as her Title VII claims, so it follows that her FMLA retaliation claims fail for the same reason—Defendants unequivocally contemplated terminating her before she inquired about her FMLA rights. Specifically, internal emails show Defendants were contemplating firing Plaintiff on October 3, 2017, but she did not inquire about her FMLA rights until October 31, 2017.    Because

"it is undisputed that [Defendants] contemplated [her termination] before Plaintiff began [her] leave[,] [t]hat [Defendants] carried out a previously contemplated action at the earliest opportunity after [her] return from leave is not evidence of pretext." *Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1225 (M.D. Fla. 2017); *see also Salem*, 788 F. App'x at 696 (holding that, even though employee was terminated while on FMLA leave, he failed to establish causation because the evidence showed that employer contemplated employee's termination before he requested his FMLA leave).

Accordingly, Defendants are entitled to summary judgment on Count IV.

## VI.   Count V - FWA Retaliation

In her fifth and final Count, Plaintiff alleges that Defendants retaliated against her by firing her because of her complaints to Mr. Mann concerning HIPAA violations made by Ms. Kermani and other staff at the Pompano Beach location.  Am Compl. ¶¶ 75-85.  Florida's Whistle-blower Act provides as follows:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (1) Disclosed, or threatened to disclose, to any appropriate government agency, under oath, in writing, an activity, policy, or practice of an employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.
>
> (2) Provided information to, or testified before, any appropriate government agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.
>
> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of law, rule, or regulation.

FLA. STAT. § 448.102.

Here, Plaintiff again relies on the same evidence as her other retaliation claims and therefore encounters a familiar obstacle. "A retaliation claim under the Florida Whistle-blower Act is guided by the same analysis as a Title VII federal claim." *Valdez v. Colony Shiny Staff, LLC*, No. 20-61323, 2021 WL 244061, at *11 (S.D. Fla. Jan. 25, 2021) (Moreno, J.) (quoting *Berber v. Wells Fargo, NA,* 798 F. App'x 476, 478 (11th Cir. 2020)) (alterations omitted). Consequently, these claims fail because the undisputed record evidence shows that Defendants contemplated terminating Plaintiff as early as October 3, 2017, which is before Plaintiff complained to Dr. Mann about potential HIPAA violations on October 23, 2017.

Accordingly, Defendants are entitled to summary judgment on Count V.

## **CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.     Defendants' Motion for Summary Judgment [ECF No. 56] is **GRANTED**. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

2.     Defendants' Motion to Strike Parts of Plaintiff's Amended Response to Defendants' Motion for Summary Judgment and Statement of Facts [ECF No. 102] is **DENIED** as moot.   The Court considered Plaintiff's Amended Response to Defendants' Motion for Summary Judgment in its entirety, and nevertheless finds that it does not raise a genuine dispute of material fact as to Plaintiff's claims.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of August, 2021.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**